CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

DEC 1 0 2008

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| RALPH E. SCHMIDT,<br>    Plaintiff, | Civil Action No. 7:08-cv-00565 |
| v. | **MEMORANDUM OPINION** |
| GENE JOHNSON, et. al.,<br>    Defendants. | By: Hon. Glen E. Conrad<br>United States District Judge |

Plaintiff Ralph E. Schmidt, a Virginia inmate proceeding pro se, brings this action under the Civil Rights Act, 42 U.S.C. § 1983, with jurisdiction vested under 28 U.S.C. § 1343. In his complaint, Schmidt alleges that officials of the Virginia Department of Corrections ("VDOC") failed to protect him against intimidation and violence at the hands of other inmates while he was incarcerated at Keen Mountain Correctional Center ("KMCC") and Nottoway Correctional Center ("NCC"). He seeks monetary damages and an injunction ordering defendants not to transfer him to any other institution due to the filing of this action. Upon careful review of Schmidt's allegations, the court concludes that all claims arising while plaintiff was housed within the jurisdiction of this court must be dismissed, pursuant to 28 U.S.C. § 1915A(b)(1),[1] and that the remaining claims concerning events that occurred within the jurisdiction of the United States District Court for the Eastern District of Virginia are appropriately severed and transferred to that court for all further consideration.[2]

---

[1] A complaint filed by an inmate challenging the conduct of an "officer or employee of a governmental entity" may be dismissed under §1915A(b)(1) if the complaint is "frivolous, malicious or fails to state a claim upon which relief may be granted."

[2] Schmidt has filed numerous motions, asking for discovery, appointment of counsel, and protective orders to prevent NCC officials from seizing and reading mail containing documents from this case and retaliating against him or against inmates who have indicated their willingness to serve as witnesses in his case. Schmidt has been placed in segregation at NCC and has not alleged any facts indicating that NCC officers have threatened him with physical harm or harassed him because of this lawsuit. In his most recent requests for interlocutory injunctive relief, he says that a friend outside the prison mailed him some documents related to this lawsuit that he never received. Because these documents contained names of inmates who may be witnesses for Schmidt in this case, Schmidt assumes that the documents were seized by prison officials, who will then retaliate in some unspecified way against these potential witnesses. He also fears that NCC officials will now seize and read all of his legal documents. On Thanksgiving Day, his family was allegedly told that

1

## Background

Schmidt alleges the following detailed sequence of acts from which his claims arise. VDOC officials transferred him to KMCC, a security Level IV institution, on or about June 10, 2005. During the next few weeks, he was "extensively and continuously harassed, threatened, intimidated and money [and] canteen items [were] extorted from him by other inmates" at KMCC, most of whom were "known notorious gang members." The inmates who victimized Schmidt would threaten him with assault or rape if he did not give them money or buy them items from the commissary or if he went to staff members for help. Schmidt claims generally that he filed "several standard inmate request forms regarding threats, intimidation and extortion to staff," and finally, sometime in mid-July 2005, he spoke personally with a staff member and asked to be placed in protective custody because he feared for his life. In response to this request, officials placed Schmidt in segregated confinement, away from other inmates, but also subject to restricted contact with family members. Schmidt suffered from loneliness, depression, anxiety, and worry; he wanted to have the same privileges as inmates in the general population, such as participation in treatment programs, outside recreation, and regular contact with family. In mid-October 2005, Schmidt asked Sgt. Hatfield, the institutional investigator for KMCC, for "release from segregation (protective custody) status." Hatfield told him that he would have to sign a request to return to the general population. Schmidt could not "endure" continued isolation in the segregation unit, so he signed a

---

they could not visit (after just having visited with him on November 23, 2008) because they are not allowed to visit any inmate in any VDOC facility. Schmidt asks the court to order NCC defendants (a) not to retaliate against him or transfer him during this litigation; and (b) not to seize or read his mail related to this lawsuit. He also wants the court to issue a protective order concerning the names and identification information about all other inmates mentioned in his pleadings, which are now two inches thick. In an abundance of caution, the court has placed under seal certain affidavits from other inmates concerning prison conditions. However, the other documents that Schmidt now wants protected are already public record. Moreover, all of Schmidt's requests for interlocutory injunctive relief are based on nothing more than speculative fears and conclusory generalizations with no factual support. Accordingly, the court will deny these motions for interlocutory relief or protective orders. Schmidt may renew such motions, if warranted, once the case is transferred to the Eastern District Court for further disposition. He may continue to pursue all other pending motions, once the case is transferred.

request asking to be transferred to B-Building at KMCC, a general population unit reputed to be safer than his previous housing assignment.

Schmidt's request was granted. Officials moved him to a cell in B Building where his cell mate was a 220-pound Muslim who was shortly transferred to Marion Correctional Treatment Center for continuously cutting himself. Schmidt's next cell mate was an active, radical member of the Bloods gang, who forced Schmidt to pay "rent in order to remain safe." Once again, Schmidt was threatened and harassed and forced to buy commissary items for certain inmates in order to remain safe. Schmidt "grew tired over the continuous inaction and action of the staff at [KMCC] and contacted his family, who contacted Warden Bassett, and . . . since Schmidt had previously requested housing in a non-smoking dormitory," officials moved him to such a dorm, housing him with another "compatible inmate who agreed to protect [Schmidt] for a [$100] monthly fee." For ten (10) months, no one else bothered Schmidt.

Then, in early September 2006, officers caught Schmidt and his cell mate engaging in sexual activity. KMCC officials placed Schmidt in isolation and thereafter tried to return him to the general population. Fearing that the extortion and harassment would begin all over again, Schmidt submitted a written statement to Sgt. Hatfield, describing everything he had endured during the last fourteen (14) months. Hatfield's investigation found probable cause to place Schmidt in protective custody status, and his counselor and the assistant warden agreed with this assessment. These officials all signed the necessary documentation to request this status for Schmidt and submitted the paperwork to the VDOC Central Classification ("CC") in Richmond for final approval. In February 2007, Duncan Mills, CC Manager, rejected the application for protective custody status on grounds that Schmidt had demonstrated a "recent poor pattern of institutional adjustment." Mills found that instead of receiving protective custody, Schmidt should be transferred to NCC. When Schmidt received notice of Mills' decision, he requested that he remain at KMCC, in protective custody or some other safer housing assignment, stating that he feared for his safety if he was transferred to

3

NCC as "the most dangerous level four (4) institution within the VADOC system." These requests and complaints went unanswered.

On July 19, 2007, officials transferred Schmidt to NCC, where he was assigned to the general population. An inmate named McNeil told him that his cell mate was a snitch and that if he did not want to be labeled as a snitch himself, he had better request to be moved to another cell. McNeil claimed that he was related to an institutional investigator who would see that Schmidt was moved to McNeil's cell, and this transfer occurred. While the two inmates shared a cell, McNeil would give Schmidt items of food and cigarettes in exchange for cash that Schmidt would send to a certain outside address where McNeil was purchasing heroin and marijuana, which he then resold for profit. McNeil soon threatened and intimidated Schmidt into using these drugs as well. Schmidt determined that he did not want to continue his involvement with McNeil's drug dealing or the dormitory where the drug deals occurred. However, he feared going directly to prison authorities because of what McNeil had said about being related to an institutional investigator. So instead, Schmidt sent a note to the Chief of NCC Security, stating that Schmidt (he himself) was using drugs and should be given a urine test. Four days later, officers gave Schmidt a urine test, he "showed positive" for drug use, and officers placed him in "punitive isolation" for a month. Thereafter, authorities placed Schmidt in general population in B-Building. Within two weeks, Schmidt underwent another random urine screen that showed positive for drug use. He believed this result to be a false positive, because it had been two months since he had used drugs. Nevertheless, he spent another month in punitive isolation.

When he was returned to the general population in mid-December 2007, Schmidt discovered that McNeil had "run up a [$400] drug debt and had put the blame on" Schmidt. Gang members approached Schmidt about the debt, and when he explained that McNeil had run up the debt, gang members "ordered a hit on" McNeil. To avoid the gang members, McNeil stayed around the dormitory. Then, on Sunday, December 16, 2007, McNeil attacked Schmidt in the recreation yard with a knife. Schmidt "sustained very severe lacerations to the head, ear and hand areas of his

4

body." Officials transported him to Southside Medical Center, where he was transported by emergency vehicle to Virginia Commonwealth University in Richmond. A plastic surgeon performed emergency reconstructive surgery on Schmidt's ear.

Late that night, Schmidt returned to NCC, where he was housed in the medical isolation unit. "[A] huge hole in the wall [led] directly outside and it was freezing cold [approx. 20 degrees Fahrenheit]." In order to get to a warmer room in the segregation area, Schmidt signed himself out of the medical unit and agreed to sign off his medications. For two days, medical staff refused to allow him a shower to clean the blood from his body. Medical staff also failed to follow the instructions of the plastic surgeon to "clean out [Schmidt's] ear" within thirty-six (36) hours.

Shortly after the attack, Schmidt asked to be allowed to contact a magistrate or speak to a special investigator about bringing criminal charges against McNeil. These requests went unanswered, and no criminal charges were brought against McNeil for the attack.

Schmidt filed this § 1983 complaint, suing KMCC Warden Bassett, Assistant Warden Pickeral, investigators Hatfield and Lockhart, and Counselor Keen for placing him in segregation when he first requested protective custody at KMCC. He also sues these officers, who approved his request for protective custody status, because they failed to override Duncan Mills' decision to disapprove Schmidt's application for protective custody and to transfer him to NCC. Schmidt also sues Mills himself for these decisions, for violating due process, and for failing to notify NCC officials of Schmidt's past request for protective custody. Finally, he sues officials at NCC for failing to supervise the recreation area sufficiently to prevent a knife attack, for failing to prevent the other acts of victimization he suffered while at NCC, for failing to allow him to bring criminal charges against McNeil, and for denying him adequate medical treatment and a prompt shower after he was injured in the attack. Plaintiff asserts that he bears physical scars and suffers mentally and emotionally from the attack.

5

## Discussion

### A. Statute of Limitations

No federal statute of limitations applies in § 1983 actions. Owens v. Okure, 488 U.S. 235, 40 (1989). Accordingly, § 1983 actions are governed by the state statute of limitations applicable for general personal injury cases in the state where the alleged violations occur. Id. In Virginia, a litigant must commence his civil action bringing any general, personal injury claim within two years of the date on which that injury accrues. See Va. Code Ann. § 8.01-243(a). A cause of action accrues "when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." Nasim v. Warden, Md. House of Correction, 64 F.3d 951, 955 (4th Cir. 1995) (en banc). An inmate's § 1983 action is commenced for purposes of the statute of limitations as soon as he delivers his complaint to prison authorities for mailing. Lewis v. Richmond City Police Depot, 947 F.2d 733, 735 (4th Cir. 1991). In Virginia § 1983 cases, then, if an inmate has not delivered his complaint to prison officials for mailing within the two-year period following the time when he knew or had reason to know of his alleged injury, he is barred from bringing suit by § 8.01-243(a).

All Schmidt's claims concerning events that occurred before October 20, 2006, must be dismissed as barred under the applicable statute of limitations. Schmidt signed and dated this § 1983 complaint on October 20, 2008. Assuming for purposes of this opinion that he also delivered it on that date to prison authorities for mailing to the court, it is considered "filed" as of that date. Thus, any events occurring more than two years before that date fall outside the limitations period mandated by § 8.01-243(a) and are time-barred. As the court has determined that the statute of limitations unquestionably provides an affirmative defense to this action, the court may summarily dismiss the time-barred portions of the complaint as frivolous, pursuant to § 1915A(b)(1), without accomplishing service on, or receiving a response from, the defendants. Nasim, 64 F.3d at 955-56 (applying prior version of § 1915).

## B. Failure to Protect Schmidt at KMCC

To state a cause of action under §1983, a plaintiff must establish that he has been deprived of rights guaranteed by the Constitution or laws of the United States and that this deprivation resulted from conduct committed by a person acting under color of state law. West v. Atkins, 487 U.S. 42 (1988). Factual allegations must be enough to raise a right to relief above the speculative level and have "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, ___,127 S. Ct. 1955, 1974 (2007).

Prison officials have a constitutional duty to take reasonable measures to protect prisoners from violence at the hands of other prisoners. Farmer v. Brennan, 511 U.S. 825, 833 (1994); Hudson v. Palmer, 468 U.S. 517, 526-27(1984); Withers v. Levine, 615 F.2d 158, 161 (4th Cir.1980) (finding that prisoners have a "constitutional right to be reasonably protected from the constant threat of violence and sexual assault from his fellow inmates") (internal quotations omitted). However, not all inmate-on-inmate injuries translate into constitutional liability for prison officials and officers. Farmer, 511 U.S. at 834. A prison official cannot be found liable under the Eighth Amendment for failing to protect an inmate unless the official knows of an excessive risk of danger to inmate health and safety, and the official knowingly and deliberately acts, or fails to act, in a manner that uniquely increases the risk. Id. at 837; Rich v. Bruce, 129 F.3d 336, 338-40 (4th Cir.1997). This is a subjective test which requires that the official both be aware of facts from which the inference of danger can be drawn, and that he draw the inference. Farmer, 511 U.S. at 837. The inferred risk of harm may be specific, see Pressly v. Hutto, 816 F.2d 977, 979 (4th Cir. 1987), or pervasive, Farmer, 511 U.S. at 842-43; Moore v. Winebrenner, 927 F.2d 1312, 1315-16 (4th Cir. 1991), but the officer must actually draw the inference so as to recognize the risk and then fail to take reasonable steps to alleviate the risk. The Eighth Amendment is not violated by negligent failure to protect inmates from violence. Moore, 927 F.2d at 1316.

7

### 1. KMCC Defendants

As stated, Schmidt may pursue claims only concerning events that occurred on or after October 20, 2006. In September or October 2006, Schmidt served a term of isolation after being caught engaging in sexual intercourse with the rent-demanding cell mate who had been "guaranteeing" his safety for the past ten months. When Schmidt returned to the general population without that cell mate's protection, he feared that the threats and extortion would begin again. So at some point during these two months, he told Defendant Hatfield the whole story and asked for protection. Hatfield placed Schmidt in segregated confinement while Hatfield investigated. Hatfield reported that he found probable cause for Schmidt to be placed in the protective custody unit, a secure area of KMCC, where inmates are segregated from the rest of the prison population, but are not subject to the same restrictions on their privileges as are inmates in the normal segregation units. The other KMCC defendants agreed with Hatfield's finding, concurred that Schmidt should be assigned to protective custody status, and sent paperwork to Richmond, requesting this status change for Schmidt. Meanwhile, they continued to house Schmidt in the regular segregation unit. Schmidt does not allege any facts indicating that other inmates victimized him in any way while he was housed in segregation.

On these facts, the court cannot find that the KMCC defendants were deliberately indifferent to Schmidt's safety. Once Schmidt made them aware of the many problems he had had in the past with other inmates, these defendants housed him in the segregation unit, away from other inmates. They investigated his story. They recommended that he be classified for assignment to the protective custody unit, and they requested approval through the proper channels within the VDOC. In other words, they responded reasonably to the risks of harm that Schmidt had faced, and would likely continue to face, in the general population at KMCC. Thus, the court will dismiss all claims that the KMCC defendants, by their own actions, violated Schmidt's constitutional rights by failing to protect him.

8

Case 7:08-cv-00565-GEC-mfu Document 25 Filed 12/10/08 Page 8 of 14 Pageid#: 296

Schmidt also asserts that these defendants violated his constitutional rights through their omissions. He argues that instead of segregating him for his safety, they should have housed him in the protective custody unit at KMCC, even without approval or in the face of disapproval from the VDOC classification department. He complains that the isolation and restrictions on telephone calls and visits from family that he faced in the segregation unit "lead to the constant threats, harassment, drug addiction and the severe attack" at NCC in December 2007. He argues that the KMCC defendants should have "overridden" Mills's decision to deny Schmidt's request for protective custody status and should have "follow[ed] up to assure compliance with" various VDOC regulations, once Mills made his decision to deny protective custody status and transfer Schmidt to NCC.

Schmidt apparently seeks to impose "bystander liability" on the KMCC defendants for failing to counteract Mills's decision in some way. This theory holds that "if a bystanding officer (1) is confronted with a fellow officer's illegal act, (2) possesses the power to prevent it, and (3) chooses not to act, he may be deemed an accomplice and treated accordingly." Randall v. Prince George's County, 302 F.3d 188, 203 (4th Cir.2002) (citing O'Neill v. Krzeminski, 839 F.2d 9, 11- 12 (2d Cir.1988) (observing that officer who stands by and does not seek to assist victim could be "tacit collaborator")). Applying the bystander theory in the Eighth Amendment context, "an officer may be liable under § 1983 if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act. Id. at 204.

The court finds no viable § 1983 claim of bystander liability here. First, the defendants had no reason to believe that housing Schmidt in segregation at KMCC, where he admits he was safe, constituted a violation of his rights.[3] See In re: Long Term Admin. Segregation of Inmates, 174 F.3d

---

[3]Schmidt also apparently seeks to impose liability on the defendants for the events that followed his own decision to sign himself out of protective segregation at KMCC. Any such claims about this period of time–October 2005 to September 2006–are time-barred. Moreover, he cannot hold the defendants liable for his own actions: his decision to sign out of segregation instead of seeking medical care for his alleged depression, his decision not to report the inmate who made him pay rent in exchange for safety, and his repeated decisions at KMCC and at NCC to violate prison regulations in order to appease threatening inmates instead of seeking protection through legitimate

9

464, 471-72 (4th Cir. 1999) (administrative segregation of inmates for three years not per se unconstitutional); Allgood v. Morris, 724 F.2d 1098, 1101 (4th Cir. 1984) (protective segregation not per se unconstitutional). They also had no reason to believe that Schmidt had any constitutional right to protective custody status or any other particular classification status within the VDOC's housing assignment system. See DeBlasio v. Johnson, 128 F. Supp.2d 315, 328-29 (E.D. Va. 2000) ("Changes . . . in a prisoners' location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges—matters which every prisoner can anticipate are contemplated by his original sentence to prison—are necessarily functions of prison management that must be left to the broad discretion of prison administrators to enable them to manage prisons safely and effectively."), aff'd, 13 Fed. App'x 96 (4th Cir. 2001) (internal quotations omitted); Gaston v. Taylor, 946 F.2d 340 (4th Cir.1991) (en banc) (citing Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454 (1989). Even if Schmidt could prove that Mills's decision to deny protective custody status violated some VDOC regulations in some way, violations of state laws do not create any federal constitutional claim. Weller v. Dep't of Social Services, 901 F.2d 387, 392 (4th Cir. 1990). Schmidt fails to allege any facts indicating that the KMCC defendants knew that he faced even greater dangers at NCC than he did at KMCC or that his transfer otherwise represented a violation of his constitutional rights. Inmates have no constitutional right to be housed in any particular prison or jail within the state where they are convicted and in Virginia, have no constitutional right to a hearing before being transferred to a prison with less favorable conditions. Olim v. Wakinekona, 461 U.S. 238, 245 (1983); Meachum v. Fano, 427 U.S. 215, 223-224 (1976); Bartholomew v. Clawson, 594 F. Supp. 1121, 1126 (E.D. Va. 1984). Moreover, the KMCC defendants could reasonably have believed that if Schmidt was being threatened or victimized at NCC, he would seek help from officers there and be protected.

Second, Schmidt fails to offer any indication that the KMCC defendants had any reasonable opportunity to prevent the alleged "harm" posed by Mills's decision. Schmidt certainly does not

---

means from prison officials.

allege that they in any way caused Mills to reject their request for Schmidt to receive protective custody status. Schmidt also points to no regulation that allows the sort of "override" of a classification department decision that he demands from them, and the court knows of none. In this case, Schmidt's own actions caused Mills to decide against protective custody. The court finds no likelihood that Schmidt could prove facts consistent with his allegations demonstrating any § 1983 liability on the part of the KMCC defendants for complying with VDOC classification rules and not fighting against Mills's decisions regarding Schmidt's classification and transfer, and all such claims will be dismissed, pursuant to § 1915A(b)(1).

Finding that Schmidt's allegations fail to state any claim against the following defendants,[4] the court will dismiss the case as to them: Warden A. J. Bassett, Assistant Warden Pickeral, Sgt. Hatfield, Investigator Lockhart, and Counselor Keen.

### B. Duncan Mills

Schmidt argues that Mills knew all the facts presented by the KMCC defendants in support of their decision to recommend approval Schmidt's request for protective custody, concerning the past victimization the inmate had faced and would likely face in the future, and that he failed to respond reasonably to these known risks of harm. As stated, Schmidt had no constitutional right to protective custody status or to be transferred to any specific prison, and he had no federal due process right to a second hearing before Mills decided to deny him protective custody status at KMCC or to transfer him to another prison facility. Moreover, the court cannot agree that Schmidt's allegations support a finding that Mills's response was unreasonable. Mills did not ignore Schmidt's history of

---

[4] Schmidt also makes vague allegations that all of the defendants created "unsafe conditions" and an "atmosphere of hate, discrimination, ridicule, and a manifestation of injustice" in which Schmidt, as a white homosexual man of small physical build, was victimized. As to events at KMCC, Schmidt may only sue regarding violations that occurred on or after October 20, 2006 and before his transfer to NCC in July 2007. During this period, he was in segregation at KMCC and not subject to the "unsafe conditions" and other adverse circumstances of which he complains. Moreover, he fails to state any separate claim that the conditions he faced in segregation violated his rights. See Strickler v. Waters, 989 F.2d 1375, 1380-1381 (4th Cir. 1993) (to state Eighth Amendment claim for cruel and unusual living conditions, plaintiff must show that he has sustained a serious or significant mental or physical injury as a result of the challenged conditions).

11

problems at KMCC, nor did he fail to take action to protect Schmidt from encountering those particular problems again. However, in determining what response was appropriate to Schmidt's request for protection, Mills took into account not only the threats and extortion from other inmates at KMCC, but also Schmidt's own history of violating prison regulations. Mills chose to deny protective custody status based on the inmate's own misbehavior and to remove Schmidt entirely from KMCC by transferring him to another institution of the same security level. Schmidt presents no facts in support of his bald assertion that NCC is "the most dangerous level four (4) institution in the VDOC." Indeed, now Schmidt wants to stay at NCC. Nor does he allege any facts indicating that Mills knew of any pervasive or specific risk of harm that Schmidt would face at NCC, or that he had any reason to believe that NCC officials could not find an appropriate method of protecting Schmidt, if he reported problems at NCC similar to the ones he had faced in the general population at KMCC. As the court cannot find that Mills's decisions regarding Schmidt's protective custody request and the transfer to NCC were an unreasonable response to the risks known to Mills, the court will dismiss these claims, pursuant to § 1915A(b)(1).

To the extent that Schmidt has alleged Mills's involvement in officials' failure to protect him from harm once he was transferred to NCC, however, the court will make no ruling. As these events occurred in another district, the court will transfer these claims to the United States District Court for the Eastern District of Virginia.

### 3. Gene Johnson

An official cannot be held automatically liable for violations of plaintiff's rights through the actions of subordinate officials; the doctrine of respondeat superior is inapplicable to §1983 actions. Fisher v. Washington Metro. Area Transit Auth., 690 F.2d 1133, 1142-43 (4th Cir. 1982). A supervisory official can be liable for damages under §1983: (1) if the conduct by subordinate employees which directly caused the deprivation was undertaken to effectuate an official policy or custom for which the official was responsible, Id., or (2) if the supervisory official was aware of a pervasive, unreasonable risk of harm to plaintiff from a specified source and failed to take corrective

12

Case 7:08-cv-00565-GEC-mfu Document 25 Filed 12/10/08 Page 12 of 14 Pageid#: 300

action himself, out of his own deliberate indifference or his tacit authorization of inaction by subordinates. Slakan v. Porter, 737 F.2d 368 (4th Cir. 1984).

Schmidt is clearly attempting to impose supervisory liability on Gene Johnson as Director of the VDOC. He does not allege any facts indicating that Johnson had any personal knowledge or involvement regarding the problems Schmidt had with other inmates at KMCC, or with the decision Mills made against protective custody classification for Schmidt. Accordingly, pursuant to § 1915A(b)(1), the court will dismiss all Schmidt's claims against Gene Johnson regarding events that occurred while Schmidt was incarcerated at KMCC.

### 4. NCC Defendants

Schmidt does not allege that any of the NCC defendants had any involvement in the decisions to deny him protective custody status and to transfer him to NCC. Accordingly, all such claims must be dismissed as to the NCC defendants, pursuant to § 1915A.

### B. Failure to Protect Schmidt at NCC

The remaining claims concern events that occurred at NCC, a prison facility located in Burkeville, Virginia, within the jurisdiction of the United States District Court for the Eastern District of Virginia. The remaining defendants are VDOC officials employed at NCC or in Richmond (Duncan Mills and Gene Johnson), which is also located within the jurisdiction of the Eastern District. Accordingly, venue as to these claims is proper in the Eastern District. See 28 U.S.C. § 1391(b). In any event, should any of the claims require a hearing or trial, the Eastern District is the more convenient forum for all parties, as plaintiff and the remaining defendants are all there. Accordingly, the court will transfer this case. See 28 U.S.C. § 1404(a).

### Conclusion

For the stated reasons, the court will dismiss all claims concerning events that occurred while Schmidt was incarcerated at KMCC and shall dismiss all claims against defendants employed at that institution. The remainder of the claims shall be transferred to the United States District Court for the Eastern District of Virginia. An appropriate order shall be entered this day.

13

The Clerk is directed to send copies of this memorandum opinion and accompanying order to plaintiff.

ENTER: This 9th day of December, 2008.

*/s/ Glen Conrad*
United States District Judge